# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Lonnie Johnson,

        Plaintiff,

        v.

City of Chicago Board of
Education,

        Defendant.

Case No. 13 C 5631

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This matter involves an employment dispute between Plaintiff and her former employer – the City of Chicago Board of Education (the "Board"). Plaintiff is an African-American female who has worked for the Defendant since 1989. In 2003, she began working at Sauganash Elementary School ("Sauganash") as a custodian. Plaintiff was involved in a number of disputes during her time at Sauganash, some of which resulted in disciplinary action against her. Plaintiff claims that her discipline was motivated by several different types of discrimination, and thus brings six causes of action: (I) disability discrimination under the Americans with Disabilities Act ("ADA"); (II) ADA retaliation; (III) Title VII race discrimination; (IV) race discrimination under 42 U.S.C. § 1981; (V) Title VII gender discrimination; and (VI) Title VII retaliation. Defendant filed a motion for summary judgment as to all counts on October 27, 2014 [38]. As explained below, that motion is granted in part and denied in part.

1

## I.    Litigation History

Since 2004, employment disputes between Plaintiff and Defendant have resulted in four federal lawsuits in this District, with this being the most recent. The prior lawsuits will be referred to as *Johnson I* (04 C 6899), *Johnson II* (05 C 4294), and *Johnson III* (07 C 1282). Plaintiff failed to prosecute *Johnson I* and *Johnson III*, and those cases were dismissed on November 12, 2004 and September 18, 2007 respectively. *Id.* at ¶¶33, 39.

With regard to *Johnson II*, Plaintiff began that proceeding by filing a charge with the EEOC on March 31, 2005. *Id.* at ¶34. The charge alleged discrimination by the Board based on race and sex, and focused on unequal terms and conditions of employment. *Id.* at ¶34. On April 28, 2005, the EEOC issued Plaintiff a right-to-sue letter based on the charge, and, on June 26, 2005, Plaintiff sued the Board. *Id.* at ¶36. The Complaint alleged discrimination based on gender, race, disability (failure to accommodate) and retaliation; and requested, among other things, that Plaintiff be granted the morning shift at Sauganash. *Id.* On January 31, 2007, the Court granted summary judgment on behalf of the Board. *Id.*

## II.    Background[1]

Defendant originally hired Plaintiff in 1989. DSOF at ¶8. In 1992, she began working as a custodian for Defendant. *Id.* On or about May 4, 2003, Plaintiff took a job at Sauganash as a custodian. *Id.* at ¶9. Christine Munns ("Munns") was the principal of Sauganash at that time, and has continued in that position through the

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to Defendant's statement of undisputed facts [42], with Plaintiff's responses where applicable [50]. "PSOF" refers to Plaintiff's statement of additional facts [50], with Defendant's responses where applicable [60].

present. *Id*. at ¶10. While Plaintiff was at Sauganash, the Board contracted some of its custodial work to private companies. *Id*. at ¶12. Thus, some of Plaintiff's co-workers included "privatized custodians." *Id*.

The central issue in this case is Plaintiff's work at Sauganash from 2007 to 2008. Plaintiff was required to work the "late shift" at the school such that her regular hours on student attendance days were from 11:00 a.m. to 7:30 p.m. DSOF Ex. 35. Plaintiff's primary responsibility was to clean classrooms and student bathrooms in two mobile units. DSOF ¶64. Principal Munns believed that this cleaning was best done after school, when the students had left for the day. *Id*. Thus, Plaintiff's work hours on student attendance days had to run until 7:30 p.m. *Id*.

Plaintiff also was responsible for securing the buildings at the end of the day (*i.e.*, shutting off the lights, closing the windows and setting the main building's alarm). DSOF ¶65. The Defendant entrusted Plaintiff, and not the privatized custodians, with these tasks because she was a Board employee. *Id*. The Board's Law Department had advised Principal Munns that a Board employee must be the individual to have the security code to set the building alarm at the end of the day unless that was not an option because the entire custodial staff was privatized. DSOF ¶66. Consequently, Plaintiff was required to secure the building because the other custodians at Sauganash were privatized custodians. *Id*.

Plaintiff did not like working the late shift, as she felt it unfairly left her to finish work left by the early shift custodians. Ans. to DSOF ¶64; P Br. at 15. These

other custodians included Felicia Mitchell and Jennifer Holloway, two African-American females with whom Plaintiff worked at various times during her tenure at Sauganash. Munn Aff. at ¶¶5-6. Plaintiff repeatedly brought her complaints regarding scheduling to Principal Munns, who refused to change the shift assignments. DSOF ¶56.

Plaintiff claims that she suffered from depression, anxiety, post-traumatic stress disorder and migraines during her time at Sauganash. DSOF ¶67. According to Plaintiff, these disorders limited her ability to: (1) work her assigned shift, PSOF ¶¶1-4; P Br. at 7-8, and (2) complete a variety of routine life activities – such as washing, eating, talking and sleeping. *Id.* Plaintiff also claims that Munns was aware of Plaintiff's disorders. PSOF ¶5. In spite of the aforementioned disorders, Plaintiff contends that she was consistently able to perform not only her duties but those of others. DSOF ¶68. These disorders, along with Plaintiff's race, sex, and prior legal actions against the Defendant, purportedly caused Defendant to suspend Plaintiff twice in 2008.[2]

On January 16, 2008, Principal Munns suspended Plaintiff for 15 days for failing to properly secure the building at the end of the day. DSOF ¶60. Plaintiff left the lights on in the building, left a window open and failed to disable access to an outside "keyless pad" which could have allowed unauthorized personnel access to

---

[2] Plaintiff refers to suspensions in both 2007 and 2008. P Br. at 5, 9, 10, 20, 22. Regarding 2007, she refers to an October 16, 2007 suspension that lasted 15 days. P Br. at 10, 20, 22. However, there is no evidence in the record of that suspension. Instead, there is evidence of a 15-day suspension beginning January 16, 2008, DSOF ¶60, and the description of that suspension matches the one Plaintiff gave for her supposed October 16, 2007 suspension. *Compare* DSOF ¶60, *with* P Br. at 20. As such, the Court will address the suspension for which there is evidence in the record – Plaintiff's suspension on January 16, 2008. With regard to the second suspension, there is no confusion or dispute in the record, Plaintiff was suspended for 30 days on April 17, 2008. DSOF ¶61.

the main building after hours. *Id.* Plaintiff disclaims fault, alleging that she had turned off the lights only to have a co-worker turn them back on. Ans. to DSOF ¶60. Plaintiff does not offer an explanation for the other failures that led to her suspension. *Id.*

On April 17, 2008, Plaintiff was suspended for 30 days due to an incident of misconduct in Principal Munns' office. DSOF ¶61. In the incident, Plaintiff came to Munns' office complaining that she was sick and proceeded to lay down on the floor. *Id.* at ¶62. Munns tried to question Plaintiff about her behavior, but Plaintiff did not respond. *Id.* Munns also asked Plaintiff who would fulfill her duties if she left work. Johnson Dep. Tr. at 202:6-14. Plaintiff claims that she was going in and out of consciousness during this incident, and that she told Munns not to call an ambulance because she couldn't afford one. Johnson Dep. p. 204:3-20. Nonetheless, an ambulance was called to assist Plaintiff. *Id.* When the ambulance arrived but before the crew could get to the office, Plaintiff walked out and left the school without saying anything. *Id.*[3]

After this incident, Plaintiff was given a notice of disciplinary action in which she was suspended 30 days for inattention to duty including, but not limited to, "sleeping on duty, or loitering in the site" and incompetently or inefficiently "performing one's duties." *Id.* at ¶61. Plaintiff's Union later grieved the suspension and the grievance went to arbitration. *Id.* at ¶63. The arbitrator found that

---

[3] While Plaintiff denies this characterization of events, she has not provided any contradictory evidence. The only evidence she cites in support of her denial is a section of her own affidavit saying "Plaintiff was driven to severe migraines by Principal Munns and her co-workers yelling and screaming at her, bullying her and threatening her." Ans. to DSOF ¶62, citing Johnson Aff. at ¶14.

Plaintiff had fallen asleep on the job in violation of Section 2-6 of the Board's discipline policy. *Id.* However, the arbitrator ultimately ruled that the 30 day suspension was not warranted and sustained the grievance. *Id.*

On August 12, 2008, Plaintiff filed a Charge with the EEOC ("Charge 564") alleging discrimination based on race, sex, disability and retaliation. *Id.* at ¶40. In particular, Plaintiff claimed that she requested a reasonable accommodation and it was denied. *Id.* Plaintiff also claimed that she was subjected to unequal terms and conditions of employment. *Id.* On May 16, 2013, the EEOC issued Plaintiff a right-to-sue letter based on Charge 564. *Id.* at ¶41. Plaintiff then filed the instant lawsuit on August 7, 2013. [1]. Plaintiff continued working as a custodian at Sauganash until September 2012, at which time she was reassigned to Chappell School by the Board's Department of Operations. DSOF ¶22. She remained working for the Board, even while this lawsuit was ongoing, and eventually resigned in November 2013. DSOF ¶26.

## III. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving

party," and the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Liberty Lobby*, 477 U.S. at 255; *see also Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).

## IV. Analysis

### a. Res Judicata

Defendant argues that the doctrine of res judicata bars certain parts of Plaintiff's claims that have been, or could have been, previously litigated. D MSJ at 3. Where a final judgment has "been rendered on the merits of a claim, res judicata protects the finality of that judgment and prevents parties from undermining it by attempting to relitigate the claim." *Palka v. City of Chicago*, 662 F.3d 428, 437 (7th Cir. 2011). In federal court, res judicata has three elements: (1) an identity of parties; (2) a final judgment on the merits; and (3) an identity of the cause of action (as determined by comparing the suits' operative facts). *U.S. ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 851 (7th Cir. 2009). Whether there is an identity of the cause of action depends on "whether the claims comprise the same core of operative facts that give rise to a remedy." *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011). Res judicata "does not preclude a suit arising from a completely different event, no matter how similar the defendant's misconduct." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 311 (7th Cir. 2010). As such, it cannot preclude claims which did not even exist and could not possibly have been sued upon in the previous case. *Singer Co. v. Skil Corp.*, 803

F.2d 336, 343 (7th Cir. 1986), citing *Lawlor v. National Screen Service*, 349 U.S. 322, 328 (1955).

Defendant argues that "Plaintiff's Title VII (race and gender), §1981 race, disability and ADA retaliation claims are barred by res judicata to the extent that such claims have been or could have been litigated in Plaintiff's three prior employment discrimination and retaliation lawsuits against the Board." D MSJ at 3. Plaintiff responds by noting that "the causes of action in dispute in this matter accrued after her last *pro se* lawsuit was dismissed in September 2007." P Br. at 5. The Court agrees with Plaintiff.

There are six causes of action at issue here. For each cause of action, Plaintiff is required to prove that an adverse employment action was wrongfully taken against her. The cause of action accrued at the time Plaintiff learned of the adverse action. *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995). Plaintiff claims the following adverse actions:

**Count I:** ADA disparate treatment discrimination based on Plaintiff's suspensions on January 16, 2008 and April 17, 2008. P Br. at 9.[4] ADA failure to accommodate based on Defendant's refusal to transfer Plaintiff to an earlier shift. P Br. at 11-12.

**Count II:** ADA retaliation based on Plaintiff's suspensions on January 16, 2008 and April 17, 2008. P Br. at 21-22.

**Count III:** Title VII race discrimination based on Plaintiff's suspensions on January 16, 2008 and April 17, 2008. P Br. at 15-16.

**Count IV:** Race discrimination under 42 U.S.C. § 1981 based on Plaintiff's suspensions on January 16, 2008 and April 17, 2008. P Br. at 15-16.

---

[4] It is undisputed that Plaintiff learned of the suspensions on the day that they were issued. *See* DSOF Exs. 38-39.

**Count V:** Title VII gender discrimination based on Plaintiff's suspensions on January 16, 2008 and April 17, 2008. P Br. at 15-16.

**Count VI:** Title VII retaliation based on Plaintiff's suspensions on January 16, 2008 and April 17, 2008. P Br. at 21-22.

Counts II-VI, along with the disparate treatment claim in Count I, are based solely on Plaintiff's suspensions, which occurred in January and April of 2008. Those claims could not have been litigated in Plaintiff's previous lawsuits, the last of which was dismissed in September 2007. *See Johnson v. Chicago Board of Ed.*, 07 C 1281 (N.D. Ill. 2007). As such, those claims are not barred by res judicata.

Slightly more complicated, however, is Plaintiff's allegation in Count I that she was denied an accommodation in violation of the ADA when Munns consistently refused to transfer her to an earlier shift. Defendant claims that "res judicata bars further litigation of not only those matters that were actually decided, but also those issues that could have been raised in a prior action." D MSJ at 3, citing *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 121 F.3d 1027,1034 (7th Cir. 1997). Defendant argues, then, that because Plaintiff had been denied the "early shift" prior to her previous lawsuits, she was required to bring that claim in those lawsuits; and because the "early shift" issue could have been raised at that time, any subsequent litigation regarding the issue is barred by res judicata. This line of argument is incorrect. *Roboserve* makes clear that once "a transaction has caused injury, all claims ***arising from that transaction*** must be brought in one suit or lost." *Id*. at 1034-1035. But where a certain violation could have been litigated in the first lawsuit, and Defendant later commits the same violation a separate time

following the conclusion of that first litigation (constituting a new "core of operative facts" or "transaction"), Plaintiff is not barred from seeking redress for the second violation. *Taylor v. Meyers*, No. 02 C 50405, 2003 WL 22706134, at *1 (N.D. Ill. Nov. 14, 2003) (a "continuing course of conduct by a defendant, even if related to conduct complained of in an earlier suit, generally creates a separate cause of action") (internal citations omitted). Thus, Plaintiff's claim for failure to accommodate based on facts occurring after the resolution of her previous lawsuits is not barred by res judicata.

### b. ADA Disability Discrimination

The ADA forbids employers from discriminating against a qualified individual with a disability because of that disability. *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015). Plaintiff may "show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). In the present matter, Plaintiff has alleged both disparate treatment and a failure to accommodate. [1] Complaint at ¶¶6-30; P Br. at 6-18. Before proceeding to the merits of those claims, the Court must first determine what version of the ADA applies here, as the Act was amended in 2008.

The ADA was significantly amended in 2008, with the law becoming effective January 1, 2009. Congress did not express its intent that the amendments be retroactive, *see* ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553

(2008), and the Seventh Circuit has found that they are not. *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009). The Court will therefore apply the version of the ADA in place when the events giving rise to Plaintiff's claims occurred. *Id.* Here, due to the ADA's 300 day time limit, the events giving rise to Plaintiff's ADA claims must have occurred between October 16, 2007 and August 12, 2008.[5] The ADA amendments only became effective on January 1, 2009. Pub.L. No. 110–325. Thus, because the events at issue occurred prior to the effective date of the ADA amendments, the Court will apply the pre-amendment version of the ADA in this matter.

### i. ADA Disparate Treatment (Count I)

To show disparate treatment under the ADA, Plaintiff may proceed under either the direct or the indirect method. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). However, because Plaintiff here proceeds only under the direct method and does not advance any argument under the indirect method, *see* P. Br. at 6-10, the Court need not address the indirect method. *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010); *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment").

---

[5] Discrimination claims under the ADA must be filed with the EEOC within 300 days of the alleged unlawful practice. *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001). Alleged discriminatory acts that do not fall within the relevant 300 day period are considered untimely and cannot be considered by the Court. *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995). Thus, only acts occurring within the 300 day period preceding the filing of the 8/12/2008 EEOC complaint (10/16/2007 – 8/12/2008) will be considered with regard to the ADA claims here.

Under the direct method, Plaintiff must show: (1) that she is disabled within the meaning of the ADA; (2) that she is qualified to perform the essential functions of the job with or without accommodation; and (3) that she has suffered an adverse employment action because of her disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). Plaintiff, however, has not satisfied her burden as to the first and third prongs.

### 1. Disability Under the ADA

Under the ADA, an individual is "disabled" if he or she: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *Stewart v. Cnty. of Brown*, 86 F.3d 107, 111 (7th Cir. 1996). Plaintiff argues that she was disabled because her depression, post-traumatic stress disorder ("PTSD"), migraines and anxiety (her "psychological disorders") substantially limited one or more major life activities. P Br. at 6-7. She also argues that she was "regarded as" disabled. *Id.*

### a. Substantial Limitation

Plaintiff was "substantially limited" if her impairment rendered her "unable to perform a major life activity that the average person in the general population can perform or [if she was] significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007). The term "substantially limits," like the other terms within the pre-

2009 ADA, is "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Ky., Inc., v. Williams*, 534 U.S. 184, 197 (2002) (overturned due to legislative action (2009) (internal citations omitted)).[6]

In deciding whether a person is disabled, courts consider "the nature and severity of the impairment, the duration and expected duration of the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Id.* at 937 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)). The court's "central inquiry is whether [Plaintiff] has an impairment that prevents or severely restricts [Plaintiff] from doing activities that are of central importance to most people's daily lives permanently or over a long term period." *Valadez v. Steiner Corp.*, 156 Fed. App'x 821, 824 (7th Cir. 2005); *Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767-68 (7th Cir. 2002) (holding that an eight week bout of depression that completely prevented plaintiff from working was not a disability as defined by the ADA).

In interpreting the pre-2009 ADA, the Supreme Court explained that it is "insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." *Williams*, 534 U.S. at 198. In other words, "merely having an impairment, such as depression, does not

---

[6] The Court is aware that the "ADA Amendments Act of 2008 superseded *Williams* by expressly rejecting the Court's narrow interpretation of the terms 'substantially limits' and 'major life activity' in favor of a broader interpretation." *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 642 n. 3 (7th Cir. 2010). However, "because there is no indication that Congress intended the ADA Amendments to have retroactive effect, we rely on the ADA as it existed at the time of the relevant events, and on the case law, including *Williams*, interpreting that version of the statute and implementing regulations." *Id*.

make an individual disabled under the statute. A claimant must also demonstrate that the impairment limits a major life activity." *Ogborn*, 305 F.3d at 767-68.

To survive summary judgment, plaintiff must provide specific facts establishing that her psychological disorders substantially limited a major life activity. *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006). Plaintiff's evidence is insufficient to survive summary judgment if it "merely states in conclusory fashion" that the problems existed, without any factual support, examples, details, or "any indication as to whether the problems are currently extant or resolved, when, where or how the problems developed, how severe they were, or how long they may have lasted." *Stein v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002).[7] It is also problematic if that evidence fails "to state whether [plaintiff] has ever been diagnosed as suffering from **these specific limitations** on her functioning or whether she has ever received medical treatment for them." *Id.* (emphasis added). Here, Plaintiff alleges that two classes of life activities have been substantially limited: (1) working, and (2) miscellaneous personal care activities.

As to the major life activity of working, the law requires that Plaintiff show she was "unable to work in a broad class of jobs." *Williams*, 534 U.S. at 200. Plaintiff must have been precluded from more than just one type of job or her particular job of choice. *Id.* Instead, a plaintiff relying on the "major life activity of working must present 'evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs

---

[7] While *Stein* was brought under the Rehabilitation Act, the determination of a disability under the Rehabilitation Act is the same as under the ADA. *Stewart v. Cnty. of Brown*, 86 F.3d 107, 111 (7th Cir. 1996); *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995).

(e.g., 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment.'" *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005) citing 29 C.F.R. Pt. 1630, App. § 1630.2(j); *see also EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1017-18 (7th Cir. 2001) (plaintiff "had to come up with some evidence of the number and types of other jobs in Southern Illinois from which the job applicants would be excluded because of their perceived impairments"). Inability to perform a single job because of an impairment does not support a claim that the Plaintiff has a substantially limiting impairment, *Lileikis v. SBC Ameritech, Inc.*, 84 F. App'x 645, 649 (7th Cir. 2003), nor does the "inability to handle a sizeable workload or a stressful workplace." *Nordwall v. Sears Roebuck & Co.*, 46 F. App'x 364, 367 (7th Cir. 2002).

Here, it is plain from the record that Plaintiff was not substantially limited in working a broad class of jobs. As an initial matter, the great weight of the evidence in the record shows that Plaintiff was not substantially limited in working *her own* job. Throughout this litigation, she has repeatedly and unequivocally stated that she was able to complete not only her own work, but the work of other custodians. Ans. to DSOF at ¶69; DSOF Ex. 1 at ¶¶ 19, 51, 61, 74, 84; Johnson Dep. Tr. at 140:7-12, 155:1-8,157:12-15. This is particularly apparent in Plaintiff's deposition testimony, where she explained that her psychological disorders had no effect on her ability to do her job from 2003 to 2007. Johnson Dep. Tr. at 73:14-22 (2003), 75:6-12 (2004); 77:1-14 (2005); 78:15-79:6 (2006); 81:22-82:1 (2007).

Plaintiff offers only two pieces of her own testimony as evidence purporting to show that she was substantially limited in doing her own job:

1. "Q. Did the PTSD, anxiety, or depression affect your ability to do your job in 2008?

   A. The treatment at the job exacerbated the mental illness, the treatment at the job exacerbated the mental illness, and the quantity of work and the mental illness. The treatment of me by Miss Munns, Principal Munns, by overworking me and treating me bad caused the mental illness to be exacerbated, to be worse, it only affected my work in that I couldn't do it all.

   Q. You couldn't do all what?

   A. All of the work that she had me doing for everybody else. I couldn't do it. I couldn't do it.

   Q Why couldn't you do it?

   A. Because it was too much. It was a punishment."  Johnson Dep. Tr. at 83:13-84:6

2. "Q. Did those conditions, that I just described, [Plaintiff's psychological disorders] and any others that you had, affect your life activities at the time you were at Sauganash?

   A. Yes.

   Q. In what way?

   A. I would be so sick that I wouldn't be able to do my job."  Johnson Dep. Tr. at 287:3-9.

While the above testimony questions Plaintiff's ability to do her own job, and, at face value, directly contradicts the majority of the evidence before the Court, it ultimately does not show that Plaintiff was unable to work in a "broad class of jobs."  Plaintiff has also failed to present any evidence showing "the number and types of other jobs in [her area] from which [she was] excluded because of [her] . .

16

. impairments." *Rockwell Int'l Corp.*, 243 F.3d at 1017-18. Instead, the evidence before the Court compels the conclusion that Plaintiff could work in a variety of jobs, including her own job, if she were given different hours. Plaintiff repeatedly testified that she could perform her job if she could work the first shift, P Br. at 8-9; PSOF ¶7, and that – for years – she was able to work without any issues related to her psychological disorders. Johnson Dep. Tr. at 73:14-22, 75:6-12; 77:1-14; 78:15-79:6; 81:22-82:1. Even after this lawsuit was filed, Plaintiff remained employed by the Board as a custodian – though her exact work assignments are not included in the record. DSOF ¶¶22, 26. This confirms that Plaintiff could have worked a broad class of jobs. Plaintiff's claim here is essentially that she could not "handle a sizeable workload," (*i.e.*, finishing up the extra work left behind by other custodians). *Nordwall v. Sears Roebuck & Co.*, 46 F. App'x 364, 367 (7th Cir. 2002). This fact, however, is not sufficient to succeed on a claim under the ADA. *Id.* In light of the paucity of evidence showing that Plaintiff could not work a broad class of jobs, and her own evidence showing that she likely *could* work in other jobs, the Court finds that Plaintiff does not qualify as substantially limited in the life activity of working.

In addition to working, Plaintiff claims that she was substantially limited in the following major life activities: washing herself, eating, talking and sleeping. P. Br. at 7; PSOF ¶¶1-3. As previously explained, the pre-2009 ADA had a "demanding standard for qualifying as disabled." *Williams*, 534 U.S. at 197. To qualify as disabled based on a substantial limitation, the major life activity at issue

must have been limited "considerably" or "to a large degree," and not merely "in a minor way." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 801 (7th Cir. 2005). It also must have been limited on a permanent or long-term basis. *Id.*

The evidence in the record here falls short. The sole evidence offered by Plaintiff in this regard comes from her own deposition testimony, where she testified:

1. "Q. Did the anxiety, depression or PTSD have any affect [sic] on your daily life activities?

   A. The job affected the mental illness and the mental illness affected everything else.

   Q. What is everything else?

   A. Everyday activities.

   Q. Can you give me an example?

   A. Washing, eating, talking, sleeping." Johnson Dep. Tr. at 82:9-16.

2. "A. I would be so sick that I didn't wash up, brush my teeth, comb my hair. I wore the same clothes sometimes three days. I would sleep on the floor. I would come home from work and just lay on the floor with my coat on, my door unlocked, and get up and go to work in the morning, just like that . . . I couldn't function. I was doing work at work, but I really wasn't at work. I had a migraine every, almost every day." Johnson Dep. Tr. at 287:8-18.

The first cited testimony is insufficient for two reasons. First, the testimony does not show that any activity was limited "considerably" or "to a large degree." It merely mentions that Plaintiff's psychological disorders "affected" her everyday activities. Second, the statement does not show that the effects of Plaintiff's psychological disorders were permanent or long-term. The quoted section of

testimony only shows that the listed activities were limited at some point in the year 2007.

The second section of quoted testimony is similarly deficient. Plaintiff has not given any examples, details, or "any indication as to whether the **_problems are currently extant or resolved_**, when, where or how the problems developed, how severe they were, or **_how long they may have lasted_**." *Stein*, 284 F.3d at 726 (emphasis added). The evidence does not provide any indication that the alleged limitation was permanent or long-term. Further, Plaintiff has failed to state whether she "has ever been diagnosed as suffering from **_these specific limitations_** on her functioning or whether she has ever received medical treatment for them." *Id.* (emphasis added). As such, Plaintiff has failed to show that any of her alleged impairments have substantially limited any major life activity, and she does not qualify as disabled under the "substantially limits" section of the ADA definition of disabled.

### b. Regarded as Disabled

Plaintiff argues that she also qualifies as disabled under the ADA because the Defendant "regarded" her as disabled. P Br. at 7. To qualify on that ground, Plaintiff must demonstrate that her "employer, rightly or wrongly," believed that she had "an impairment that substantially limit[ed] one or more major life activities." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 335 (7th Cir. 2004). To establish a "regarded as" claim, however, it is "not enough for a plaintiff to show that the employer knew of the plaintiff's impairment." *Amadio v. Ford Motor Co.*,

238 F.3d 919, 925 (7th Cir. 2001). The Plaintiff must also show that the employer believed that one or more of the Plaintiff's major life activities were substantially limited by Plaintiff's impairment. *Id.* Plaintiff has not met that burden here.

Plaintiff has presented minimal evidence that Defendant knew of her impairments generally, but no evidence that Defendant believed those impairments substantially limited any life activities. Plaintiff has presented the following segments of her own deposition testimony to show Defendant's supposed knowledge of her impairments:

1. "Q. Do you believe that anyone at the Board thought that you were disabled in 2005?

   A. The Board knew I was ill in 2005. The Board knew I was ill in 2003." Johnson Dep. Tr. at 86:3-11.

2. "Q. How did Principal Munns know that you were disabled in 2005?

   A. She knew that I was ill, and the reason that I was ill because when she hired me, I sat across from her and told her." Johnson Dep. Tr. at 86:12-23.

3. "A. I explained to [Principal Munns] that I was ill. That I had been sexually harassed. I had a nervous breakdown. I was hospitalized. I don't recall if I told her I was suicidal." Johnson Dep. Tr. at 4-14.

4. "A. I told [Principal Munns] I was going to the doctor because I had a nervous breakdown and I had migraines and I was ill." Johnson Dep. Tr. at 90:7-9.

Plaintiff also generally describes the incident in which she had to lay down in Munns' office due to her alleged "incapacitation," but was able to walk away as soon as the ambulance arrived. P Br. at 7. While Plaintiff has presented some evidence that Munns was generally aware that Plaintiff had certain physchological issues,

she did not provide any evidence showing that Defendant regarded those issues as substantially limiting Plaintiff in any way. In fact, the evidence shows just the opposite, as Plaintiff repeatedly claims that Defendant relied on her to perform extra or additional work, including securing the building at night. Ans. to DSOF ¶52; DSOF ¶65. This suggests that Munns believed Plaintiff *was not* substantially limited. Plaintiff thus does not qualify as disabled under the ADA "regarded as" definition.

## 2. Causation

Even if Plaintiff did qualify as disabled under the ADA, her claim would nonetheless fail under the "direct method" because she has submitted no evidence that her alleged disability *caused* any adverse action against her. Because Plaintiff has no direct evidence that Defendant's actions were based upon her disability, she must present circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Suspicious timing of an employment decision, when presented along with "other bits and pieces" of circumstantial evidence creating a "convincing mosaic of discrimination," can permit an inference of discriminatory motive. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994). Plaintiff cannot show causation because she has presented no such evidence here.

Plaintiff claims that adverse actions were taken against her when she was suspended in January and April 2008. P Br. at 9. However, Plaintiff's only evidence that these actions were taken because of her disability is the unsupported

statement in her response brief that the "discipline was directly related to Johnson's disability." *Id.* Contradicting her own claim mere sentences later, Plaintiff then states that she was disciplined because of "performance issues," (*i.e.*, she did not complete certain tasks that were assigned to her). *Id.* at 9-10.

Defendant further explained that Plaintiff was suspended because: (1) she failed to properly secure the building – including leaving a window open and failing to disable access to an outside keyless pad which would have allowed access to the school; and (2) she slept on duty, loitered on site, and incompetently or inefficiently performed her duties. DSOF at ¶60-61. Plaintiff has presented no evidence showing that the adverse actions were taken against her *because of* her alleged disability. As such, she has not met her burden under the direct method. Summary judgment is granted in Defendant's favor on Plaintiff's claim of disparate treatment under the ADA.

### c. ADA Failure to Accommodate (Count I)

The elements of an ADA failure to accommodate claim are: "(1) the plaintiff must be a qualified individual with a disability; (2) the employer must be aware of the plaintiff's disability; and (3) the employer must have failed to reasonably accommodate the disability." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). Plaintiff fails in at least two regards here.

### i. Disability

For the reasons explained above, Plaintiff was not disabled as defined under the ADA. As such, Plaintiff cannot prevail on her claim for failure to accommodate

under the ADA. Summary judgment is therefore granted in the Defendant's favor on the failure to accommodate claim in Count I.

### ii. Ability to Perform the Essential Functions of her Job

Even if the Court agreed with Plaintiff that she qualified as disabled under the ADA, it would nonetheless grant Defendant's motion with regard to the failure to accommodate claim. To prevail on an accommodation claim, Plaintiff must show that she "needed an accommodation to perform the essential functions of the job at issue." *Brumfield*, 735 F.3d at 633. In *Brumfield*, the plaintiff claimed that the defendant failed to accommodate her unspecified "psychological problems." *Id*. at 622. The court explained, however, that "to be entitled to an accommodation, a disabled employee must have a physical or mental limitation that prevents her from performing an essential function of the particular job at issue." *Id*. at 633. The court found that the plaintiff had not met that requirement because her four psychological examinations determined that she was fit to perform her duties. *Id*.

Plaintiff's own brief, and the factual record supporting it, show that she cannot prevail on her failure to accommodate claim because she was, in fact, able to perform the essential functions of her job without accommodation. In her response brief, Plaintiff argues as follows:

> "Johnson testified that her job duties at Defendant were to 'maintain the cleanliness as to safety and the condition of the school inside and out.' (Johnson Dep. p.15:24) Although she experienced increasing headaches related to the stress of overwork which substantially limited her ability to work, wash herself, eat, talk and sleep, Johnson was still able to clean during her hours of work as a Custodian. (Pl. SOF ¶2) The facts demonstrate that Johnson was capable of actually cleaning without an accommodation. (Def. SOF ¶69)." P Br. at 8.

The factual record supports this argument, as Plaintiff has admitted that she was "consistently able to perform not only her duties but those of others." DSOF ¶69. Because Plaintiff did not need "an accommodation to perform the essential functions of the job at issue," *Brumfield*, 735 F.3d at 633, her failure to accommodate claim is unavailing. Summary judgment is granted in favor of the Defendant on that claim.

### d. Racial Discrimination (Counts III and IV)

Plaintiff contends that the Board discriminated against her based on race in violation of Title VII (Count III) and 42 U.S.C. § 1981 (Count IV). Specifically, Plaintiff claims that the Defendant discriminated against her when it "disciplined and suspended [her] without pay for not completing the work of others (in addition to her own work)." P. Br. at 16. The Court will address each Count in turn.

### i. Racial Discrimination under Section 1981 (Count IV)

Plaintiff's claim under Section 1981 fails because it was not timely filed. Plaintiff filed this lawsuit on August 7, 2013. [1]. The statute of limitations on claims brought pursuant to Section 1981 is four years. *Dandy v. UPS*, 388 F.3d 263, 269 (7th Cir. 2004). Therefore, Plaintiffs §1981 claim is limited to addressing discriminatory conduct occurring after August 7, 2009. The only adverse employment actions claimed by Plaintiff here are the January and April 2008 suspensions. P. Br. at 15-16. Thus, Plaintiff's Section 1981 claim is time barred. Defendant's motion for summary judgment is granted with regard to Count IV.

### ii. Racial Discrimination under Title VII (Count III)

A plaintiff claiming race discrimination under Title VII can use either the direct or indirect method. *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). Here, because Plaintiff argues only the indirect method, P. Br. at 13, the Court will confine its analysis accordingly. *Id.* at 680; *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Under the indirect method, Plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate expectations at the time of the adverse action; and (4) the employer treated similarly situated employees not in the protected class more favorably. *Mintz*, 788 F.3d at 673. Plaintiff's claim here fails because there is no evidence that the Defendant treated similarly situated employees not in the protected class more favorably.

### 1. Similarly Situated Employees

To qualify as similarly situated, a fellow employee must be "directly comparable to the plaintiff in all material respects." *Walker v. Bd. of Regents of the Univ. of Wis. Sys.*, 410 F.3d 387, 397 (7th Cir. 2005). The similarly situated analysis calls for a "flexible, common-sense" examination of all relevant factors. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). Plaintiff must be "similarly situated with respect to performance, qualifications, and conduct," and must show that the other employee "engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's

treatment of them." *Id.* The purpose of the "similarly-situated" comparator employee is to ensure that all other variables are discounted so that discrimination can be inferred. *Silverman v. Board of Education*, 637 F.3d 729, 742 (7th Cir. 2011). The comparators must be similar enough that any differences in their treatment cannot be attributed to other variables. *Id.* Generally, a plaintiff must show that the other employee: "1) dealt with the same supervisor; 2) was subject to the same standards; and 3) engaged in similar conduct." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). Plaintiff has set out only three proposed comparator employees: Jennifer Holloway, Felicia Mitchell, and Angel Marin. P Br. at 18-19.[8]

With regard to Holloway and Mitchell, they cannot serve as comparators because they are both African-American, and therefore fall within the same protected class as Plaintiff. Under the indirect method, Plaintiff must show that "the employer treated similarly situated employees ***not in the protected class*** more favorably." *Mintz*, 788 F.3d at 673 (emphasis added). The central idea is that Plaintiff can show discrimination based on race by presenting evidence that individuals of other races were treated more favorably. For claims of racial discrimination, then, the proposed comparator cannot be someone of the same race. *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005); *Mokry v. Partylite*

---

[8] Because Plaintiff's response brief only claims three comparators, the Court will confine its analysis to those three individuals. The Court will not comb the record searching for additional possibilities. *See Marron v. Eby-Brown Co., LLC*, No. 11-CV-2584, 2013 WL 870577, at *6 (N.D. Ill. Mar. 7, 2013) ("it is not the Court's job to make Plaintiff's argument . . . to figure out who Plaintiff claims as comparators"); *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, No. 03 C 5529, 2008 WL 4389834, at *1 (N.D. Ill. Sept. 24, 2008) *aff'd*, 600 F.3d 878 (7th Cir. 2010) ("it is not this court's job to make arguments or marshal evidence for represented parties").

*Worldwide, Inc.*, No. 07 C 0972, 2009 WL 2588888, at *14 (N.D. Ill. Aug. 20, 2009). Plaintiff is African-American. DSOF ¶1. Holloway and Mitchell are African-American. [60-1] Munns Aff. at ¶¶5-6. As such, Holloway and Mitchell cannot serve as comparators for the similarly situated analysis.

With regard to Marin, he is not similarly situated for two reasons. First, he was not employed by Defendant at the time of Plaintiff's suspensions. Plaintiff must show that she was similarly situated to Marin at the time of the alleged discrimination against her. *Jordan*, 396 F.3d at 834; *Lillie v. Chartwells*, No. 04 C 5453, 2007 WL 951900, at *5 (N.D. Ill. Mar. 26, 2007) ("in determining whether two employees are similarly situated, the inquiry must focus on the time of the job action at issue"). Marin did not begin working at Sauganash until the 2012-2013 school-year, i.e., four years after the suspensions at issue here. Munns Dep. Tr. at 57:7-13. Marin therefore cannot serve as a comparator. Second, there is no evidence that Marin engaged in conduct similar to the Plaintiff's but was treated more favorably. The only evidence presented regarding Marin is that he was given the morning shift instead of Plaintiff at some point in the 2012-2013 school-year. PSOF ¶27. This is insufficient to show that he engaged in conduct similar to the Plaintiff's without being suspended.

Because Plaintiff has provided no evidence showing that similarly situated employees outside of her protected class were treated more favorably, she cannot succeed on her Title VII claim for racial discrimination. Defendant's motion for summary judgment is granted with regard to Count III.

### e. Gender Discrimination (Count V)

In addition to race discrimination, Plaintiff claims that she was discriminated against due to her gender in violation of Title VII. P Br. at 13. A plaintiff "alleging sex discrimination in employment under Title VII can proceed under either the direct method or the indirect, burden-shifting method." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008). Here, Plaintiff has opted to proceed under only the indirect method, P Br. at 13, so the Court will do likewise. *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010).

Under the indirect method, as with her race claims, Plaintiff must show that: "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008). Plaintiff's claim fails because she has not provided any evidence of similarly situated employees outside of the protected class who received more favorable treatment.

### i. Similarly Situated Employees

As with her claim for racial discrimination, Plaintiff has offered only three proposed comparators for her claim of gender discrimination: Jennifer Holloway, Felicia Mitchell, and Angel Marin. P Br. at 18-19. Holloway and Mitchell are both

women. [60-1] Munns Aff. at ¶¶5-6. Plaintiff is also a woman. DSOF ¶1. As explained above, Holloway and Mitchell cannot serve as comparators here because they are within the same protected class as Plaintiff – female. *Jordan*, 396 F.3d at 833; *Mokry*, 2009 WL 2588888, at *14. With regard to Marin, he cannot serve as a comparator on Plaintiff's gender discrimination claim for the same reasons he could not serve as a comparator for her racial discrimination claim. He was not employed at Suaganash until four years after the suspensions at issue, and he did not engage in the same conduct as Plaintiff. *See supra* Part IV(d)(ii)(1). Defendant's motion for summary judgment is granted with regard to Count V.

### f. Retaliation (Counts II and VI)

Plaintiff claims that Defendant retaliated against her in violation of both the ADA (Count II) and Title VII (Count VI). Plaintiff alleges generally that the Defendant retaliated against her for filing several EEOC charges and lawsuits complaining of Defendant's conduct. P. Br. at 22. That retaliation took the form of the two suspensions previously discussed in this Opinion. *Id.*[9]

Plaintiff may prove her claim for retaliation under either the direct or the indirect method. *Anderson*, 521 F. supp. 2d at 788. Here, because Plaintiff limits herself to the direct method, the Court will do so as well. *See* P. Br. at 21. The direct method requires Plaintiff to show that: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th

---

[9] Because Plaintiff bases her retaliation claims on her January 2008 and April 2008 suspensions, P Br. at 21-22, the Court need not address Defendant's argument that Plaintiff's retaliation claims based on events prior to October 16, 2007 are time barred. *See* D MSJ at 6-7.

Cir. 2013).[10]  In its motion, the Defendant does not challenge the first two elements, but argues only that "Plaintiff cannot establish a causal connection between her protected activity and the alleged adverse actions." D MSJ at 22.  Because the standard for establishing causation on a claim for retaliation is different under Title VII and the ADA, the Court will address each Count separately.

### i. ADA Retaliation (Count II)

To establish causation on a claim for retaliation under the ADA, the Plaintiff must show that her protected activity was a "substantial or motivating factor" behind the adverse employment action.  *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 495 (7th Cir. 2014).[11]  She can do so by presenting either a direct admission of a retaliatory motive or a "convincing mosaic" of circumstantial evidence supporting an inference that a retaliatory animus was at work.  *Id.* Seventh Circuit case law has identified three general categories of circumstantial evidence: (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn"; (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and (3) "evidence that the employer offered a pretextual reason for an adverse employment action."  *Cloe*, 712 F.3d at 1180.

---

[10] The three elements of a retaliation claim are the same under Title VII and the ADA.  *Anderson v. The Foster Grp.*, 521 F. Supp. 2d 758, 788 (N.D. Ill. 2007); *Bob-Manuel v. Chipotle Mexican Grill, Inc.*, 2014 WL 185978 n. 7 (N.D. Ill. 2014).

[11] While much of the ADA's language was amended by the 2008 amendments, the provision describing what retaliatory conduct is forbidden by the ADA was not amended. *See* 42 U.S.C. § 12203(a); *Freelain v. Vill. of Oak Park*, No. 13 C 3682, 2014 WL 148739, at *9 (N.D. Ill. Jan. 15, 2014).  Therefore the Court need not limit its consideration to pre-amendment case-law when discussing Plaintiff's claims for ADA retaliation.

To address causation, the Court must first identify the protected activities and adverse actions that are at issue. The adverse actions claimed by Plaintiff are her suspensions in January and April of 2008. P Br. at 21-22. Protected activities include asserting rights under the ADA by either seeking an accommodation or by raising a claim of discrimination due to disability. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814-15 (7th Cir. 2015). Plaintiff claims that she engaged in protected activity when she filed charges of discrimination against the Defendant in March 2004, June 2004, March 2005 and November 2006. [1] Cmplt. at ¶81. She also filed related lawsuits in October 2004, July 2005, and March 2007. DSOF ¶¶33, 36, 39.[12]

Plaintiff contends that two types of evidence show causation here: (1) statements allegedly made by Munns; and (2) the timing between Plaintiff's protected acts and the adverse actions taken against her. With regard to statements by Munns, Plaintiff cites the following:

1. "A. When I filed charges against the principal, she was angry, and she didn't want to talk to me. So she would tell, I was doing Stevy's work also, and I filed charges about that, and I asked her nicely, you know, it's not fair that I do his work while he's not in the building. I asked her three times nicely, and then I filed charges. After I filed charges, she was angry, and Judy, the clerk, told me, came and got me and told me she was angry. And Mike came and told me that Stevy failed the inspection, and Principal Munns told Mike to tell me to do Stevy's corners, so Stevy could pass the inspection." Johnson Dep. Tr. at 113: 3-15.

---

[12] While Plaintiff's requests for accommodation (*i.e.*, the early shift) could possibly be considered a protected activity, Plaintiff has set forth no argument claiming those requests as a protected activity, explaining how they were a protected activity, or showing how they led to the adverse action taken against her. *See* P Br. at 21-22. The Court will not attempt to make that argument for her. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, No. 03 C 5529, 2008 WL 4389834, at *1 (N.D. Ill. Sept. 24, 2008) aff'd, 600 F.3d 878 (7th Cir. 2010) ("it is not this court's job to make arguments or marshal evidence for represented parties").

2. "A. And when Yasmina was in the hallway –

   Q. Is that the next incident?

   A. That was in 2007.

   Q. Do you recall approximately when in 2007, the first half, the second half?

   A. The second half. I was in the hallway, and I asked the principal could Yasmina do her own work, and she said, I told her that that was wrong and it's discrimination, and every new employee that comes, why do I have to do their work. And she said stop suing me, just like that." Johnson Dep. Tr. at 219:11-22.

3. "Q. Okay. Do you believe that Miss Munns was treating Miss Holloway better than you?

   A Yes . . .

   Q. And why do you believe that, what is the basis for your belief?

   A. Retaliation.

   Q. And why do you think it's retaliation?

   A. Because Miss Munns –

   Q. You have to speak up.

   A. Because Principal Munns knew that I was suing her.  She stated to me that she was tired of being sued.

   Q. When did she tell you that?

   A. When Yesmina, she said, quit suing me in 2007, quit suing.  She said quit suing. I asked her for the morning shift. Why did I have to do Yesmina's work. She said quit suing.  Like that would have solved it.  I'm sorry, I forgot the question.

   MR. GOMBERG: Q The question is what makes you believe that Miss Munns was treating Holloway and Mitchell better than you because of retaliation?

A. Because she knew I was suing her. She would say, I would ask her the morning shift, for the morning shift for accommodation, and she would always say basically the same thing. If you don't like the way you're treated, find another school. Or she would say, I don't care, find another school. Just get out." Johnson Dep. Tr. at 276:13-278:18.

The first statement by Munns was likely made in the year 2005, and is thus too far removed to infer retaliatory conduct. *See* DSOF ¶¶27-29; Johnson Dep. Tr. at 113: 3-15. The second and third statements, however, were made in the second half of 2007. The record then shows the following: (1) Plaintiff sued the Board alleging disability discrimination on March 7, 2007; (2) that suit was ongoing until September 18, 2007; (3) sometime in the second half of 2007, Munns made a series of angry comments to Plaintiff complaining about Plaintiff's lawsuits while suggesting that Plaintiff get another job; and (4) Plaintiff was suspended on January 16, 2008. Drawing all inferences in Plaintiff's favor (as this Court must at this stage of the proceedings), this is sufficient facts to create a convincing mosaic of evidence showing a retaliatory motive. Defendant's motion for summary judgment is denied with regard to Count II.

### ii. Title VI Retaliation (Count VI)

To establish causation under Title VII, a plaintiff must show that the protected activity was the "but-for" cause of the employer's decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013); *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n. 1 (7th Cir. 2014). Despite this "but-for" requirement under Title VII, courts have continued to interpret the causation requirement under Title VII similarly to the causation requirement under the ADA. *See Ripberger v. Corizon,*

*Inc.*, 773 F.3d 871, 881 (7th Cir. 2014); *Yost v. Chicago Park Dist.*, 17 F. Supp. 3d 803, 812 (N.D. Ill. 2014). As with ADA retaliation, Title VII retaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and "other bits and pieces from which an inference of discriminatory intent might be drawn." *Ripberger*, 773 F.3d at 881. As explained above, the course of events in this matter is – drawing all inferences in Plaintiff's favor – sufficient to allow a reasonable jury to find retaliatory motive. Defendant's motion for summary judgment is denied with regard to Count VI.

## V.  Conclusion

In light of the foregoing, Defendant's motion for summary judgment [38] is granted with regard to Counts I, III, IV, and V. It is denied with regard to Counts II and VI. This matter is set for a status hearing at 10:45 a.m., on November 5, 2015, in Courtroom 1725. At that time, the parties shall come to Court prepared to discuss: (1) the possibility of settlement; and (2) a jury trial of this matter scheduled on December 7, 2015.


IT IS SO ORDERED

Dated: November 2, 2015                    Entered:



                                           United States District Judge

34